1

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3    HEB GROCERY COMPANY, LP        ()        CIVIL ACTION
                                     ()        NO. H-17-2810
 4    VS.                            ()        HOUSTON, TEXAS
                                     ()        AUGUST 3, 2018
 5    TODD MEAGHER, ET AL            ()        10:32 A.M.

 6

                          TRANSCRIPT OF CONFERENCE
 7                 BEFORE THE HONORABLE LYNN N. HUGHES

 8

 9    APPEARANCES:

10

11    FOR THE PLAINTIFF:       Mr. Tyson D. Smith
                               Pirkey Barber, PLLC
12                             600 Congress Ave., Suite 2120
                               Austin, Texas  78701

13

14    FOR THE DEFENDANTS:      Mr. Gary L. Pate
                               Thompson, Coe, Cousins & Irons, LLP
15                             One Riverway, Suite 1400
                               Houston, Texas  77056

16

17    COURT REPORTER:          Anita G. Manley
                               Court Reporter
18                             c/o 515 Rusk, 8th Floor
                               Houston, Texas  77002

19

20

21

22    Proceedings recorded by stenographic means, transcript produced
      by computer.
23

24

25
```

2

1                    P R O C E E D I N G S

2          THE COURT:  What was Mrs. Butt's -- was it Harriet?

3          MR. PATE:  That sure sounds right.

4          THE COURT:  I don't remember the E.

5          MR. SMITH:  It's a great question.  I want to say that

6     the "H.E." might be for Henry.

7          THE COURT:  Aren't they your client?

8          MR. SMITH:  Yes, sir.  That's something I should know.

9          THE COURT:  You ought to.  Mr. Butt, Sr., was injured

10    at work.  And so, like a good Texas woman, she said, "Don't

11    worry about it" and opened a grocery store in Kerrville -- I

12    think it's Kerrville -- and ran it for a very long time.  Or

13    one of her sons who worked with her, Charles.  That's her

14    initials, best I can recall.

15              And I'd never shopped at an HEB because it was a

16    more regional chain until I went to law school in this

17    socialist place called Austin.  And so, I went in and the store

18    is four times the size of this room.  It was literally a

19    neighborhood grocery store, long before the war.  I said, "I

20    can't find a can opener."

21        (Discussion off the record.)

22          THE COURT:  All right.  What else do you want?

23          MR. PATE:  Judge, my -- we have made many go-rounds

24    towards trying to resolve this and settle this, and we just

25    can't get to a place of settlement.  They --

1           THE COURT:  What's -- what's the hang-up?

2           MR. PATE:  The hang-up is twofold.  It's very clear.

3               Your Honor, could I shut that door?  I'm hard of

4     hearing.

5           THE COURT:  No.  Wait right there.

6           MR. PATE:  Okay.

7           THE COURT:  We have people.

8               When Baker Botts built their new building in '69,

9     I was impressed because, if you were a partner, you could push

10    a button on your desk and the door fell open by a magnetic

11    thing and it would close.

12          MR. PATE:  I remember that.  Yeah.  Yeah.

13              And thank you for closing the door.

14              The two hang-ups are thus:  We have never

15    infringed.  We used the marks, MyStore, for eight years with no

16    objection.  We've invested millions of dollars into this brand.

17    We have investors to the stature of Julian Lennon, the son of

18    John Lennon, other investors who've invested a ton --

19          THE COURT:  And you found it cleared?

20          MR. PATE:  I'm sorry?  Yes, yes.  It did.  It did.

21              And they want an injunction against us, and

22    there's no basis for an injunction whatsoever.  There's no

23    irreparable harm, imminent injury, anything like that.  But

24    they want an injunction so they can hang that on their wall and

25    say, "Look how we ran MyStore out of business for infringing

4

1    upon our marks" when we've never infringed upon their marks.

2              Second, my client --

3         THE COURT:  So I thought Mi Tienda was your mark.

4         MR. SMITH:  It is.  It is.  And we disagree that the

5    defendants have not infringed HEB's mark.

6         THE COURT:  Wait.  Wait.  You get paid a lot of money.

7              HEB doesn't have a piece of paper from the

8    Trademark Office for MyStore.

9         MR. SMITH:  It has two incontestable registrations for

10   Mi Tienda, which is the trademark --

11        THE COURT:  No.  Wait.  Answer my question.

12             You do not have anything as we sit here today

13   from the gnomes in the Trademark Office that says, "We agree

14   you have a monopoly; that's what it says"?

15        MR. SMITH:  HEB does not have any registrations for

16   the English words "my store," that is correct.

17        THE COURT:  Do you know what "my store" is in German?

18        MR. SMITH:  I don't.

19        MR. PATE:  I was born in Germany, and I don't know the

20   answer to that.

21        THE COURT:  I barely speak English, so I don't.

22        MR. SMITH:  I know what it is in Spanish, and a

23   significant segment of the population in Texas does know what

24   that is -- that's "mi tienda" -- which is where the Doctrine of

25   Foreign Equivalents comes in to make them identical.

1    THE COURT:  I don't think they're identical.  Why

2  didn't you get -- who says that Mi Tienda is covered in

3  Vietnamese; in Gujarat; in Hindu; in Arabic, classical and

4  spoken?

5        What do they speak in Croatia?

6    MR. SMITH:  Croatian, I believe.

7        But, Your Honor, those languages are different in

8  Spanish.  Spanish is a very prevalent language.  And the legal

9  Doctrine of Foreign Equivalents --

10    THE COURT:  Where did that come from, legal doctrine?

11    MR. SMITH:  The courts and the Trademark Trial and

12  Appeal Board.  It's a -- even in the Fifth Circuit, they've

13  recognized the Doctrine of Foreign Equivalents.

14    THE COURT:  There's a chain of Fifth Circuit law.  I'm

15  a United States judge and it's a United States statute that

16  you're enforcing, right?

17    MR. SMITH:  Right.

18    THE COURT:  So I want to know which court has the best

19  reasoning for why.

20    MR. SMITH:  Well --

21    THE COURT:  Somebody who gets -- you go to use the

22  offbeat language.  They want to use English.  Right?

23    MR. SMITH:  But they also have a -- they're also

24  claiming use of Mitienda, the Spanish version as well, which is

25  in their -- which is in our pleading, actually.

6

1          THE COURT:  Well, I know, but pleadings -- you make

2    that stuff up, both of you.

3          MR. SMITH:  Well, except that Mrs. Meagher filed an

4    application to register Mitienda in Spanish and claimed use of

5    that mark as well.

6          THE COURT:  But you're not pressing that.

7          MR. PATE:  I'm not --

8          THE COURT:  You're not pressing that.

9          MR. PATE:  No, no.  We pretty much abandoned all

10   efforts to go after Mitienda.

11              Could I tell you something really interesting?

12         THE COURT:  So quit talking about something they've

13   already given up on.

14         MR. SMITH:  And --

15         THE COURT:  No.  Stop that.

16         MR. PATE:  Well, you're absolutely right.  We -- we

17   have stopped pressing for Mitienda.

18              But something fascinating about Mi Tienda, their

19   mark, and we agree, is Mi Tienda, two words, "my store."

20   That's one of their registrations.

21              We applied for Mitienda, one word, with the

22   USPTO.  And the trademark examiner wrote back to us and said,

23   "We have searched the United States Patent and Trademark

24   databases and we don't see a conflict."  And so they could see

25   Mi Tienda, their mark.  And so there's no conflict, just --

1          MR. SMITH:  Well --

2          THE COURT:  Wait.  Don't interrupt people.

3          MR. PATE:  Because ours was one word.  But they

4   flagged one item they've said may be a conflict, and the item

5   they flagged that may be a conflict was our own registration

6   for MyStore because Mitienda, one word, and MyStore, one word,

7   they said, "This could be a potential conflict."

8               And I have the correspondence from the trademark

9   examiner saying, "This is the potential conflict."

10          THE COURT:  Can you separate it?

11          MR. PATE:  We don't want to separate it because --

12          THE COURT:  I know that.

13          MR. PATE:  -- our mark has always been singular.

14   That's been our brand, MyStore, one word, and Mitienda, one

15   word.  But we -- in deference to the --

16          THE COURT:  How long have you been using it?

17          MR. PATE:  Since 2005, prior to their first use in

18   commerce.

19          MR. SMITH:  Well, and that's one of the things that

20   they've asked for judicial notice of, that HEB does not oppose,

21   is they first used MyStore and MyStore.com November 1st of

22   2005.  But HEB's registrations, they applied for those in March

23   of 2005.  And so, the Lanham Act says that constructive first

24   use depends on the application date rather than the first use

25   date.  And so, HEB's first use date, which is what we've

 1  requested judicial notice of, is that their constructive first

 2  use date under the Lanham Act is March 1st -- or March 22nd, I

 3  believe, of 2005.

 4        And to Mr. Pate's point about the examining

 5  attorney and the PTO examination of the Meaghers' marks, the

 6  fact that the examining attorney flagged MyStore as potentially

 7  confusingly similar to Mi Tienda I think goes to our point that

 8  our client's Mi Tienda marks and the English version could be

 9  confusingly similar and taken that way.  And also the fact that

10  there's a space in one mark and not a space in another mark I

11  don't think is enough to mitigate the confusion in the public.

12  When the public sees Mi Tienda with a space or Mitienda without

13  a space, they're going to understand what it is, the same with

14  the English version.

15        And then the last point on that --

16        THE COURT:  Why don't you do both?  If you want a

17  trademark on it, get a trademark on it.  Don't --

18        MR. SMITH:  Well, the issue with the trademark is you

19  can only get a registration for how you actually use the mark,

20  and HEB does use the mark with the space:  Mi, space, Tienda.

21        THE COURT:  That's what you told them?

22        MR. SMITH:  Correct.

23        MR. PATE:  Their use of the mark always has the Aztec

24  sun in the middle of it.  Now, they have registrations with and

25  without the Aztec sun, but they use it in commerce with the

1    Aztec sun.  And their exemplar they submitted to the United

2    States Patent and Trademark is a grocery store circular with

3    the Aztec sun in between the two words Mi Tienda.

4              MR. SMITH:  But that's -- I don't --

5              THE COURT:  Wait, wait.

6              MR. PATE:  And the trademark examining attorney --

7              THE COURT:  That's our sun, too, isn't it?

8              MR. PATE:  Yes, yes.  That's true.  It's the same sun.

9              MR. SMITH:  The Aztec.

10             THE COURT:  It's a graphic of a logo, Aztec's logo.

11             MR. PATE:  That's true.

12             THE COURT:  They start selling sacrificial victims and

13   other Aztec goods.

14             MR. PATE:  So, you know, the breakdown in the

15   settlement negotiations were exactly that.  They want an

16   injunction.  There's absolutely no need for an injunction.

17   That's the purpose and the function of the United States Patent

18   and Trademark Office.  They have examining attorneys that look

19   for the precise issue of likelihood of confusion so that there

20   is no confusion, which we're here discussing.

21             THE COURT:  What do you-all sell?  What do you sell?

22             MR. PATE:  We sell Internet interactive services for

23   exchange of goods and services.  No groceries whatsoever.  So,

24   if you have a business, say, for instance, of giving piano

25   lessons, you could sign up on MyStore and advertise your piano

10

1   teaching services.  There is no confusion whatsoever or

2   likelihood of confusion that we're in the grocery business.  We

3   don't have --

4            THE COURT:  You're sort of like eBay?

5            MR. PATE:  Yes, exactly.

6            THE COURT:  I mean, because some -- some people just

7   sell stuff.

8            MR. PATE:  Right.

9            THE COURT:  But you do the same thing that eBay, the

10  company, does which is charge people to advertise their goods

11  on your site.

12           MR. PATE:  Right.

13           THE COURT:  So, there are no MyStore goods?

14           MR. PATE:  No, no.

15               And I think something really --

16           THE COURT:  It's not a real company if you don't have

17  a company T-shirt.

18           MR. PATE:  Have you seen our Web page from -- can I

19  show the Court?

20           THE COURT:  Yeah.

21           MR. PATE:  (Indicating)  To me, this drives home the

22  point.

23           THE COURT:  Right after you leave, I'll look at the

24  Web sites.

25           MR. PATE:  This is from our joint chronology and --

1    first of all, this is a Mi Tienda specimen.  This is a grocery

2    store circular that they submitted to the United States Patent

3    and Trademark Office in support of their registration.

4                    And then below that is one screenshot from ours.

5                    The next page, I think, has a bigger screenshot.

6    That's real -- or maybe the next page after that.

7              THE COURT:  Lots of trademark seals.

8              MR. PATE:  Yes.  There's their Aztec sun.  That's

9    their mark.  I may have a better copy of --

10             MR. SMITH:  And, Your Honor, while you're looking at

11   that, I would just point out that HEB's mark is not limited to

12   the design mark.  It's the actual word mark, Mi Tienda.  The

13   designs have nothing to do with this case.

14             THE COURT:  Wait.  But you're claiming copyright on

15   the design.

16             MR. SMITH:  Well, we have a trademark for the -- for

17   the word mark without the design, and we use it without the

18   design as well.

19             THE COURT:  But you also --

20             MR. SMITH:  Correct.  But the problem --

21             THE COURT:  Answer my question.

22             MR. SMITH:  Yes.  Well --

23             THE COURT:  You have a copyright on this design.

24             MR. SMITH:  We have a registration for -- I can't see

25   what you're pointing to.

 1          THE COURT:  Aztec.

 2          MR. SMITH:  HEB has a registration for Mi Tienda and

 3   design, and they also have a registration for just the word

 4   mark.

 5          THE COURT:  That's back here.

 6          MR. SMITH:  Okay.

 7          THE COURT:  And my memory is bad, but it's not that

 8   bad.

 9          MR. PATE:  I think I can find a better screenshot on

10   here.  I know -- there it is.

11          THE COURT:  That's you.

12          MR. PATE:  I wish.  He has better hair than I have.

13          THE COURT:  Oh, no.

14          MR. PATE:  But you can see there's nothing in that

15   that would give the impression that we're in the grocery store

16   business.  We have never held ourselves out in the grocery

17   store business.  And under the United States Patent and

18   Trademark Office, our classification of international class of

19   business is not the grocery store business.  And so, there's

20   never been any likelihood of confusion, and the trademark

21   examiners determined that as well.

22          MR. SMITH:  May I respond to that, Your Honor?

23          THE COURT:  Sure, with something new.

24          MR. SMITH:  Well, just to his point -- I mean, he

25   keeps bringing up these specimens and registrations.  First of

1   all, Mr. Meagher's registrations are canceled and they have no

2   evidentiary relevance to this case.

3           THE COURT:  Yes, they do.

4           MR. SMITH:  In what way?

5           THE COURT:  Well, you're claiming they're bandits and

6   they're counterfeiting stuff.  What they did do and what they

7   didn't do and what they did do and now sorry are all relevant.

8           MR. SMITH:  Well, how they used it may be relevant,

9   but their registrations provide no evidentiary benefit to them

10  because they're canceled.  They don't own valid trademark

11  registrations anymore.

12          THE COURT:  That's different from it not being useful

13  to what they could have claimed and decided they couldn't or

14  whatever else.  That's helpful.

15          MR. SMITH:  Okay.  And then the second --

16          THE COURT:  Because you probably pleaded for

17  $183 million in punitive damages because they're evil

18  trespassers.

19          MR. SMITH:  So, HEB actually didn't claim damages at

20  all.  We haven't sought damages.

21              But, second of all, as far as the specimens go,

22  those are simply tools for an examining attorney.  They -- the

23  specimens, as we point out in our -- in our briefing, are used

24  only to prove what an applicant -- a trademark applicant is

25  saying in their registrations.  It's only for ex parte

1    examination.  And there can be --

2            THE COURT:  What does that mean?

3            MR. SMITH:  It means it's only between the applicant

4    and the Trademark Office, not in a dispute.

5            THE COURT:  No, it's not.  It's between the applicant

6    and the world.

7            MR. SMITH:  But -- but what my point is, is that

8    comparing specimens, you can't limit an evaluation of

9    confusion by looking only --

10            THE COURT:  That's different from saying it's no good

11    for anything, which is what I just said.  No, they don't have a

12    copyright, trademark, patent or any of that other stuff that

13    they do.

14            What they're saying is, "This is what we do.

15    This is what we said.  We can't do that, so we're not going to

16    do that.  But we don't think that renting space on our

17    billboard to other people is the least bit in a parallel, much

18    less coterminous, market for selling groceries."

19            MR. SMITH:  Well, and on that point, Your Honor,

20    there's nothing that limits them from not using -- if a grocery

21    store comes to -- comes to them and says, "I want to put my

22    grocery store business on MyStore.com," there's nothing that --

23            THE COURT:  The sale of groceries will not be by

24    MyStore.  The sale of groceries would be that drug debilitated

25    rock star.  Right?

1          MR. SMITH:  What's that?

2          THE COURT:  They're not -- if there's a grocery store

3    on MyStore, it will be this guy holding a banana, saying, "Buy

4    it from the Little Rock Emporium" or whatever his -- that's

5    going to be the ad.

6          MR. SMITH:  Except I don't think that's accurate

7    because this picture is of someone's business.  And a grocery

8    store could be a mom-and-pop-shop grocery store on the corner

9    that says, "Hey, I want to advertise my mom-and-pop grocery

10   store on the MyStore Web site."  That's another person

11   advertising on MyStore.com.  So that will be a separate place

12   on the Web site.  So the grocery store will have no connection

13   with what you're looking at there.

14         THE COURT:  Then --

15         MR. SMITH:  So that's just one example of one

16   person's --

17         THE COURT:  eBay offers all kinds of stuff.

18         MR. SMITH:  Right.  And that's exactly the issue.

19         THE COURT:  Services, everything.  Not eBay itself

20   but....

21             The *Houston Chronicle* offers advertising and will

22   promote business.  They're not selling *Chronicle* bananas or

23   avocados.  I like both of them.

24         MR. PATE:  That's exactly right.

25         THE COURT:  They're selling ugly, screaming people.

1          MR. PATE:  That's right.

2          MR. SMITH:  But -- but they could.  And back to the

3   point of --

4          THE COURT:  No.  There's absolutely nothing that says

5   that MyStore is going to go into the retail grocery business.

6          MR. SMITH:  And to that exact -- to that precise --

7          THE COURT:  Somebody could get on here and sell the

8   pecans they raised in Colorado County, Texas.

9          MR. PATE:  Right.

10          THE COURT:  Because they -- they won't have either a

11   large Internet presence or anything physical.

12          MR. PATE:  That's right.

13          MR. SMITH:  And -- and to that point, Your Honor, as

14   we've discussed settlement, HEB is completely willing to settle

15   with some assurance, like an injunction, that they can use

16   MyStore as long as they don't do it in the grocery business.

17   HEB will -- has no problem with that as long as they have

18   assurances they won't use it in a grocery business or for

19   anything related to the grocery business.

20          THE COURT:  If they will agree not to use MyStore as a

21   seller of groceries, right?

22          MR. PATE:  We've already told them MyStore --

23          THE COURT:  Just say "yes, sir."

24          MR. PATE:  Yes, sir.

25          THE COURT:  There.

1    MR. SMITH:  And, Your Honor, we thought we had a

2  settlement precisely with that arrangement even last week.

3    THE COURT:  That doesn't mean it's not going to say

4  MyStore where eBay would be or any of the other -- I'm not

5  advertising or promoting eBay.  It's the only one I can

6  remember at the moment.

7    MR. PATE:  Right.

8    MR. SMITH:  So -- so, Your Honor, last week Mr. Pate

9  called us and said his client was willing to settle and sign an

10  injunction or settle with an injunction --

11    MR. PATE:  I'm not signing an injunction.

12    MR. SMITH:  Signing a consent judgment that included

13  an injunction as long as it made clear that he could use

14  MyStore, English version MyStore, for anything except for

15  grocery -- not in the grocery business.  We said, "Okay.

16  Great."  We sent him the consent judgment we submitted to the

17  Court.

18    THE COURT:  Just have an agreement.

19    MR. SMITH:  Um --

20    THE COURT:  Because you want to embarrass him.

21    MR. SMITH:  No.  We really -- HEB really does not --

22  it's really all about the assurances and being able to make

23  sure that they can't use MyStore in a grocery --

24    THE COURT:  They agreed not to do it.  Why do you have

25  any idea they'll do it?  They haven't done it yet.

 1          MR. SMITH:  Well, I mean, even in their -- even in

 2    their summary judgment briefings, they said that they've

 3    stopped using the marks pending the outcome of this case.

 4    Their Web sites, they said they've taken them down but they say

 5    they're in transition.  They're simply waiting for this lawsuit

 6    to end so they can start operating again, and that's HEB's

 7    concern.

 8          THE COURT:  But they've never -- their operation is

 9    not evil.

10          MR. SMITH:  Well, we're not saying it's evil.  We just

11    want to -- HEB just wants to make sure that when they do start

12    operating again, it will not be in a problematic manner.

13          THE COURT:  I don't think MyStore -- is MyStore

14    willing to say it will not carry ads for groceries?

15          MR. PATE:  I don't know that it's willing to say it

16    won't carry other people's ads for groceries.  It would be

17    impractical to sell groceries through the Internet.

18          THE COURT:  That's what everybody said when Amazon

19    started.

20          MR. PATE:  Right, right.  But, Your Honor, I think the

21    important thing is -- let me model this out.  If we tomorrow

22    decided that we wanted to get a trademark registration for

23    Mi Tienda and sell groceries, we would apply to the United

24    States Patent and Trademark Office and it would forthwith be

25    kicked back because it would conflict with them in the

1   database.  And, so, they want an injunction for something

2   that's already in place, and that is the examining attorneys.

3   The screen for this kind of likelihood of confusion, that's

4   exactly what they're on target to do.

5           MR. SMITH:  Although, the examining attorney only

6   relates to registration.  They could not apply to register a

7   mark and still use it.  They don't have to apply to register.

8   So that screening really would have -- they don't have to do

9   that to use it.

10          THE COURT:  That's fine.  I just -- if MyStore itself

11  does not use MyStore in conjunction with retail groceries, if

12  they want to sell wholesale avocados to the Canadians -- they

13  don't have any up there -- that's not -- we'll worry about

14  that.

15          MR. SMITH:  Although, avocados are sold in our

16  clients' grocery stores, Mi Tienda grocery stores.

17          THE COURT:  Of course.

18          MR. SMITH:  So, there is potential confusion if

19  they're operating under My --

20          THE COURT:  -- wholesale in Canada.

21          MR. SMITH:  Well --

22          THE COURT:  Wholesale.

23          MR. SMITH:  If it's somebody that gets onto the

24  MyStore Web site that lives next to a Mi Tienda grocery store,

25  they could think it is the same if they're using Mitienda or

1    MyStore.

2            THE COURT:  And if somebody wants to buy -- which I

3    would've if my wife would let me -- 100 pounds of avocados a

4    week, that's not a retail transaction.

5            MR. SMITH:  And I think -- I think you're getting to

6    really where HEB hopes we can get with an injunction.

7            THE COURT:  No.  We've got two businesses.  They've

8    got an extraordinarily minor dispute.

9                    This is clear (indicating).  Not your musician,

10   but somewhere in here is your copyright.

11           MR. SMITH:  Meaning that HEB has the registration?

12           THE COURT:  Yes.

13           MR. SMITH:  Correct.

14           THE COURT:  That's not what they're doing.

15                    And I'm not saying that Mr. Butt will not go into

16   the Internet submarket business and rent space.  He might do

17   that.  He can do it.  He just can't call it MyStore.  Because

18   they've been doing it.  That's what they do for a living,

19   is they're -- they allow people to post their ads on their

20   program.

21           MR. PATE:  Right.  And there is a word for that.

22   There's some articles on that very thing, and it's called

23   "trademark bullying."  And that's what My -- trademark

24   bullying.  That is the big company using little --

25           THE COURT:  No.  Skip the populist stuff.

1      MR. PATE:  Right, right.

2          Trying to run the little company out of business,

3  and they have effectively run us out of business.  So, my

4  client has asked me to accomplish a couple of things today,

5  that is, get a scheduling order and trial date because we want

6  to try this.  We don't think a jury is going to be confused at

7  all between HEB, the grocery store, and MyStore.  And we want a

8  trial on our counterclaims.

9          We also asked the Court for leave to amend our

10  counterclaims.  We have filed a motion for leave to amend our

11  counterclaims, and we want to prosecute this.

12      THE COURT:  Don't you just want to go away and get

13  your business back up and running?

14      MR. PATE:  Unfortunately, they have run our business

15  out of business.  We have some fuming investors right now that

16  are very mad.

17      THE COURT:  I know, but mad is not a basis for --

18      MR. PATE:  Right.

19      THE COURT:  -- wasting a whole bunch of money in

20  litigation.

21      MR. PATE:  Plus --

22      THE COURT:  HEB will go away.  Y'all will have a

23  written agreement, which I will be a witness to.  I'll sign it,

24  but it's not going to be an injunction, that you are not

25  claiming MyStore for use in conjunction with retail whatever.

1    Is there a number for that?

2            MR. SMITH:  Well, the classes are really irrelevant.

3    They're just for convenience of the PTO.  It's really more

4    about what they're actually doing.

5            So, HEB would -- I mean, we can certainly talk to

6    them about whether, instead of an injunction, doing an

7    agreement that's enforceable, that the Court has jurisdiction

8    to enforce, that allows -- and that's really why HEB is willing

9    to -- they're willing to allow them to continue using it for --

10           THE COURT:  No.  I'm willing.

11           MR. SMITH:  -- non-grocery store services.

12           THE COURT:  I am.

13           MR. SMITH:  But to have an agreement, HEB also has to

14   be --

15           THE COURT:  They're not going to be the grocery store.

16   It doesn't mean they can't sell avocados on their -- that they

17   can't rent space to other people who sell avocados.  And

18   everybody on their space will have their own trade name, their

19   marketing, you know, even if it's Charlie's Screaming Nut.  I

20   think that's available if anybody wants to have a copyright.

21           And they're not going to do it.

22           MR. SMITH:  Who's not going to do it?  I'm not --

23           THE COURT:  They're not going to use it to sell

24   groceries.  MyStore will not retail groceries.  They probably

25   won't do it not only online but in any store.  If they do, I'll

1  fix it.

2          MR. SMITH:  So the language that we've been using is

3  "retail grocery store services and grocery products."

4          THE COURT:  Grocery store services.

5          MR. SMITH:  That's what -- that's what our trademark

6  registrations covers, grocery store services.

7          THE COURT:  Grocery store service.

8          MR. SMITH:  Offering grocery store items to the

9  public.

10          THE COURT:  Groceries.

11          MR. SMITH:  Right, but it's different in a trademark

12  context than selling a grocery product and offering the

13  services.  So, if HEB has --

14          THE COURT:  The service is a sale of goods.

15          MR. SMITH:  Correct, and that's different than

16  actually having a branded can of tomatoes that says Mi Tienda

17  on it.  The store says Mi Tienda, but their cans of tomatoes

18  are sold by Del Monte or the avocados are from --

19          THE COURT:  So far.

20          MR. SMITH:  So far.  Right.  And that's exactly --

21  that's exactly why we would want it to cover services and

22  products.

23          THE COURT:  But their service is limited to, so I can

24  talk like a bureaucrat, "facilitating marketing of independent

25  companies' stuff."  And if -- I can't read the screenshot,

1   but -- you think that's a woman?

2          MR. PATE:  That's a -- that's a man, I thought.

3          THE COURT:  That's what I thought, but....

4          MR. SMITH:  You sounded like Aerosmith to me,

5   actually.

6          MR. PATE:  But it's facilitating of the small

7   business.

8          THE COURT:  It may be.

9          MR. SMITH:  Yeah.  Facilitating of the small business.

10          THE COURT:  I don't want to say small.  If Amazon

11   wants to hire space on Myspace, I think you better --

12          MR. PATE:  We'd welcome them.

13          MR. SMITH:  And if there -- if Amazon is selling

14   groceries on there, then that becomes a problem.

15          THE COURT:  No, because it's not --

16          MR. PATE:  It's not MyStore.

17          MR. SMITH:  Well, and that's -- and that's -- I think

18   that's what HEB's position would be, is that it's still likely

19   to cause confusion among consumers if they're doing that.

20          THE COURT:  No.  It's going to say Amazon.  Amazon is

21   very proud of --

22          MR. SMITH:  Exactly.  If Amazon did it.  But if

23   somebody the size of Amazon does that, well --

24          THE COURT:  Nobody is going to pay any attention to

25   MyStore if it says Amazon.  You know, Amazon sells third-party

1  stuff all the time, and people say, "Oh, it's been terrible for
2  the little man."  No, it hasn't, from somebody who buys an
3  inordinate number of books every year.
4              Earlier in the week, the postman said, "Here's
5  your book for today."
6              They buy it.  I mean, it says who the actual
7  vendor is.  And they're simply some --
8         MR. PATE:  Facilitating it.
9         THE COURT:  You know, they're subleasing their Web
10  network, and there's some very good customers, people who can
11  take advantage of it.  And that applies to all kinds of stuff.
12  You can buy clothing and vitamins.  And I think you can get
13  almost anything on Amazon.
14         MR. SMITH:  Might be true.  Might be true.
15         THE COURT:  I've been using Amazon since -- I think it
16  says '96 on the screen.  But if I'd done it a year and a half
17  earlier, there would probably be a building named for me.
18  Their first customer has got a big office building of theirs
19  named after them.  I just missed it.
20              And it's not a ruling, but I think that's the
21  answer, if you can get back to business.  There's no way your
22  investors are going to make money off of suing them, even if
23  they win, because they will have been non-operating for a time.
24  And you're very expensive, I trust.  He's expensive.  And the
25  likelihood of winning any lawsuit, any lawsuit, is 60/40

1  against, assuming you don't have a confession in your hand or

2  something.

3            That's the only thing that makes sense for your

4  people.  And, yes, they've a little overreached with their

5  pleadings, but who doesn't.  I mean, I find it irritating,

6  but....

7            MR. PATE:  I think Your Honor --

8            THE COURT:  It's just -- I'm not talking about the

9  copyright people.

10            MR. PATE:  I think Your Honor has seized upon the

11  relevant point here.  They have said we'll settle with them,

12  and they've been saying this for a couple of months now.

13            THE COURT:  You're agreeing not to use MyStore.  If

14  somebody wants to be a grocery vendor on your site, you can't

15  rent them the name MyStore for the groceries.

16            MR. PATE:  We're not going to give them the name

17  MyStore.

18            THE COURT:  That gets you things.

19            MR. PATE:  Right.  But your illustration -- your

20  illustration of the avocados is good.  If Charlie wants to sell

21  avocados under the name Charlie's Avocado Company, then we'll

22  rent them space on our Web site to do that.  They're not

23  MySpace avocados and we're not in the grocery business.

24            THE COURT:  People can license their trademarks.

25            MR. PATE:  Right.

1          THE COURT:  So you'll commit not to license your

2     trademark to a grocery store.

3          MR. PATE:  I'd have to ask my client, but I'm sure

4     that would be agreeable.  But I don't see any way to settle

5     with them just by the breadth of their desired terms.  "Grocery

6     services and products."  You've identified how nebulous

7     "grocery services" are.  But "grocery products" is also very

8     confusing.  If you walk in an HEB today, you could probably buy

9     a Houston Texans jersey, a Houston Astros jersey, all kinds of

10    clothes, hats.

11         THE COURT:  Liquor.

12         MR. PATE:  I'm sorry?

13         THE COURT:  Liquor.

14         MR. PATE:  Liquor.  You can buy liquor, all kinds of

15    stuff.  And so, if we have somebody --

16         THE COURT:  Cosmetics, which is a huge industry.  I

17    think it's bigger --

18         MR. PATE:  Yes, cosmetics are big.

19              But if we had somebody that wanted to sell

20    jerseys on our Web site, they could claim, well, we're now

21    breaching that agreement because that's a grocery-related

22    product because we sell jerseys.

23         MR. SMITH:  It's not a food product, though.

24         MR. PATE:  It doesn't say "food product" in any of

25    your permutations of your settlement agreement.

1        THE COURT:  Wait.  Don't, don't, don't --

2        MR. PATE:  So, I think --

3        THE COURT:  Well, groceries means food.
4  Groceries-related products might be peelers and dicers, pots
5  and pans.  But you're not going to do it.  You're not going to
6  sell anything.

7        MR. PATE:  We may sell pots and pans.

8        THE COURT:  No.  You will rent space on your Web
9  site --

10        MR. PATE:  Right.

11        THE COURT:  -- to a -- MyStore is not going to use
12  "MyStore" in conjunction with its sale of anything related to
13  groceries.  Reasonably related to groceries.

14        MR. PATE:  Uh-huh.

15        THE COURT:  I'm not saying if -- is there an A&P store
16  left in America?

17        MR. PATE:  I don't think so.

18        MR. SMITH:  I'm not familiar with those.

19        MR. PATE:  I remember those, though.

20        THE COURT:  A&P, which is Atlantic and Pacific Tea
21  Company, and Sears and Roebuck were the top two retailers in
22  America for most of my youth.  And there may be some small
23  towns that still have an A&P.

24        MR. SMITH:  That could be.

25        THE COURT:  So when I was running for the legislature

1   in my youth, a friend of mine was in Vietnam with the Army, but

2   he was a gifted speechwriter.  So I would get from APO an

3   address -- the return address on the envelope with "Greater

4   Atlantic & Pacific Hughes Committees."  And he could -- I never

5   thought I had a style.  That doesn't mean it's good.  I just

6   thought I talked.  But he could mimic me from half a world away

7   on a contemporary issue on Texas politics.  I didn't win.  It

8   wasn't his fault.

9              All right.  That's what I think you ought to do.

10   You all can get back to doing what you're doing, and you with

11   Mi Tienda.  And you won't sell Internet space and they won't

12   sell groceries.  They'll sell Internet space.  What do you call

13   it?

14         MR. PATE:  We call it "interactive Internet social

15   media marketing."

16         THE COURT:  Okay.

17         MR. SMITH:  Which is fairly broad.  It doesn't exclude

18   groceries.

19         THE COURT:  They're not marketing anything but the

20   space to market.  Think of his client as Gerald Hines.  They

21   build buildings and rent them to other people.  They don't much

22   care what you do.  And if somebody rents a building from Gerald

23   Hines and puts a grocery store in it and puts up Mi Tienda, you

24   better get busy; but you're not going to sue Gerald Hines.

25   You're going to sue the store.

1              All right.  You all want to take three days and
2    come up with -- I don't want all the boilerplate garbage.  I'd
3    just like to see the draft you all can agree on.  Or just put
4    blanks on the parts you can't and have alternative text for
5    that sentence so I can see it.
6              MR. SMITH:  We can certainly give that a shot.
7              MR. PATE:  Your Honor, I don't mean to be unreasonably
8    pessimistic, but I'll say one thing.  The Court asked us to do
9    a joint chronology, and they could not agree with our joint --
10             THE COURT:  No.
11             MR. PATE:  And then, second --
12             THE COURT:  No.  He's awful.
13             MR. PATE:  No.  He's -- he's a very nice person.  He's
14   a very nice person, but they have a very different agenda than
15   we do.
16             Then, second, this Court has said, by order, the
17   parties are to submit a settlement agreement.
18             THE COURT:  I don't want to rehash all this.
19             What we're going to do is save your client and
20   his client from spending a whole bunch of more money on
21   something that doesn't strike me that it cannot simply be
22   cabined to limiting your client to -- what are those things --
23   like a flea market.
24             MR. PATE:  Right.
25             THE COURT:  Your people -- your client rents booths.

1    People who sell counterfeit Disney movies in the booth are not

2    his responsibility.

3                    So, you're going to agree to that and not to

4    use -- ever sell groceries or grocery-related products, if

5    that's what the Trademark Office calls it, yourself retail.

6                    Because yours was under retail, right?

7              MR. SMITH:  I -- I believe so.

8              THE COURT:  If you decide to go into the wholesale

9    grocery business just as a practical matter, you can just call

10   it "Lynn Hughes" or something and not Mi Tienda or MyStore or

11   anything similar.  Tuesday?

12             MR. PATE:  Tuesday?

13             THE COURT:  Can you do it?

14             MR. SMITH:  I probably won't get back to the office

15   today, driving back to Austin.  So that will leave us just

16   Monday to go back and forth.

17             THE COURT:  Don't tell people you're from Austin.

18             MR. SMITH:  Unfortunately or fortunately, depending on

19   how you look at it, that's where I'm from.

20                    So Wednesday, I think, would be -- if we could

21   even have until Wednesday, I think that would be helpful.

22             THE COURT:  All right.  Are you going to do it

23   yourself or are you going to make some young person do it?

24             MR. SMITH:  Probably a little bit of both.

25             THE COURT:  All right.  So, I want it by 9:27 a.m.,

1   Thursday, August 9th.  Is that right?

2          MR. PATE:  And this is the settle agreement?

3          THE COURT:  No.  This is the guts of the settlement

4   agreement.

5          MR. PATE:  The guts of the settlement agreement.

6          THE COURT:  I don't want 18 pages of defined terms and

7   all that stuff you-all do.  I want something -- it can't take

8   more than one page of paper, half a page, to say what the guts

9   of the deal is.

10         MR. SMITH:  So, sort of like a terms sheet.

11         THE COURT:  Exactly.  In fact, I was going to say,

12  businessmen can settle down and write the terms, one sheet of

13  paper.  Y'all get a hold of it and it's 86 pages that they just

14  have to -- they've got other things to do -- assume it's right,

15  they sign it, and turns out there's a Norwegian arbitration

16  clause or something.

17      (Discussion off the record)

18         THE COURT:  All right.  Don't write like a lawyer.

19  Write like a businessman:  Here's what we're going to do.  And

20  you can use the company's preferred description of

21  intergalactic electronic goods and services or whatever you

22  said.  In English, say some folksy analogy, like the flea

23  market, but make it clear what we're talking about.

24         MR. PATE:  Okay.

25         THE COURT:  Like job descriptions today, they're that

1   long and say nothing.  Okay?

2            MR. PATE:  Very good.

3            MR. SMITH:  Great.

4            THE COURT:  All right.  So he's got to drive, so you

5   take a stab at a draft.

6            MR. PATE:  First draft.

7            THE COURT:  And get it to him.

8            MR. PATE:  Will do.  Thank you, Your Honor.

9            THE COURT:  Yes, sir.

10            MR. SMITH:  Good to see you, Your Honor.

11            THE COURT:  It's good to see you all.

12        (Concluding at 11:18 a.m.)

13

14   I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE
     RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER, TO THE BEST
15   OF MY ABILITY.

16   _____        ___8/13/18___
     ANITA G. MANLEY
17   COURT REPORTER

18

19

20

21

22

23

24

25